Boon Pieng Lim, also known as John Yao v. Commissioner.
Lim v. Commissioner
Docket No. 87177.
United States Tax Court
T.C. Memo 1963-85; 1963 Tax Ct. Memo LEXIS 259; 22 T.C.M. (CCH) 393; T.C.M. (RIA) 63085; March 25, 1963
Sidney U. Hiken, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined deficiencies in income tax, additions to tax for fraud under section 6653(b) of the Internal Revenue Code of 1954, and an addition to tax under section 294(d)(1)(A) of the 1939 Code against the petitioner as follows: Addition under
Addition under Sec.
Sec. 6653(b),
294(d)(1)(A),
I.R.C. of
I.R.C. of
Year
Deficiency
1954
1939
1954
$ 1,396.48
$ 698.24
$129.37
1955
4,746.71
2,373.35
1956
72,104.95
36,052.47
1957
83,884.30
41,942.15
At the call of the case for trial, there was no appearance for petitioner and respondent moved for its dismissal as to the deficiencies and the addition *260 to tax for 1954 under section 294(d)(1)(A) and for entry of decision for the deficiencies and the addition to tax as shown in the notice of deficiency. The motion was granted, leaving for trial only the respondent's determination of additions to tax for fraud. Findings of Fact The petitioner is a Chinese National and a resident of the Republic of the Philippines. He arrived in the United States on October 15, 1954, as a non-immigrant alien under a student visa. For some periods of time not shown he was enrolled in colleges in Los Angeles and San Francisco, California. Following his arrival in the United States, petitioner opened several bank accounts with the Bank of America and the Bank of California, both in San Francisco. Variously these accounts were in the names of Boon Pieng Lim, "his Chinese name"; John Yao, his "Christian" name; John and Rosita Yao, Rosita being his sister; Herbert B. Youngberg, a name sometimes used by him; and Marjon Trading and Express Company. At times the deposits made were in amounts of as much as $40,000 to $50,000. The funds deposited in the bank accounts, in substantial part if not wholly, represented receipts from the sale of Philippine pesos *261 and their delivery in the Philippine Republic. During the years in question the Philippine peso was "blocked" and the legal exchange and delivery of foreign funds in pesos in the Philippines was through the National Bank of the Philippines. The legal rate of exchange for American dollars was two pesos for each dollar. There was, however, an active black market in which the rate of exchange was much more favorable to the dollar. As a consequence, black market purchase and delivery of pesos was used by many persons, particularly Philippine Nationals, having American dollars but desiring to deliver pesos to parties in the Philippines. Channels were available to petitioner through which he acquired black market pesos at very favorable rates and he also had channels through which he could make delivery thereof in the Philippines. In the main, if not wholly, petitioner's customers were Philippine Nationals in the United States, Guam and Wake, and Deak and Company of San Francisco. Deak and Company is a banking organization dealing in foreign currency. Through agents in San Francisco, Guam and Wake, petitioner would receive American dollars for which he would arrange for the delivery *262 of pesos at an agreed rate in the Philippines. One method of delivering dollars to petitioner or to his bank for deposit was through the use of money orders. At times his agents on Guam and Wake would accumulate the dollars to amounts of several thousand and would then transfer them to petitioner through branches of the Bank of America in Guam, Wake and Hawaii. The commission paid by petitioner to his agent in San Francisco was two cents on each dollar. With respect to the business done with Deak and Company, persons desiring delivery of pesos in the Philippines would pay U.S. dollars to Deak and Company which would buy pesos from petitioner and arrange with him for their delivery in the Philippines. In these transactions he was required to obtain for Deak and Company signed receipts from the parties to whom the pesos were delivered in the Philippines. For the years 1955 through 1958, petitioner's deposits in the above bank accounts amounted in the aggregate to approximately $10,000,000. Periodically he would make transfers of funds, up to $20,000 to $30,000 at a time, from the accounts to Hong Kong. He also made payments from the amounts such as $4,700 for a Lincoln automobile, *263 $20,000 as the down payment on a home purchased for $55,000 and mortgage payments thereafter, $5,000 to $6,000 as premiums on life insurance policies with New York Life Insurance Company and Franklin Life Insurance Company, approximately $4,700 for stock in Hycon Manufacturing Company, and $40,000 to $45,000 as an investment in Marjon Trading and Express Company. On some undisclosed date prior to 1958, he had procured a change of his status in the United States from that of student to treaty trader and opened a business as an importer and exporter of goods between the United States and the Philippines and Hong Kong, under the name Marjon Trading and Express Company, with offices in San Francisco. From his business of dealing in and delivering the black market pesos, petitioner in each of the taxable years earned a substantial profit. He maintained no accounts and records covering such dealing, but did maintain books for Marjon Trading and Express Company. Petitioner filed no income tax return for any taxable year herein, when due, and since the various due dates has filed no such return. An investigation of petitioner's liability for Federal income tax for the years 1954 through *264 1957 was started in January of 1959, one investigator being a special agent in the Intelligence Division of the Internal Revenue Service. At first, petitioner advised the agent that his father was a businessman in Manila and that the deposits in his various bank accounts had to do with his father's transactions between Manila, the United States and Hong Kong. After the agent and his associate or associates had made an analysis of petitioner's bank accounts, petitioner was questioned with respect thereto, at which time he admitted that the deposits represented monies received from the sale of Philippine pesos. He produced no records and advised the agent that all of his bank statements and canceled checks had been destroyed. In October of 1959, the agent learned from petitioner that he was transferring all of his assets from the United States. He sold the San Francisco home he had purchased, closed his bank accounts and transferred the funds therefrom to Hong Kong. Jeopardy assessments of income tax against petitioner were set up. *
*265 Petitioner left the United States early in 1962 and returned to the Philippines. A part, if not all, of the deficiency for each of the years 1954, 1955, 1956 and 1957 is due to fraud. Opinion In section 6653 of the Internal Revenue Code of 1954, it is provided that if any part of an underpayment of income tax is due to fraud, there is to be added to the tax an amount equal to 50 percent of the underpayment, and in section 6653(c)(1), an underpayment is defined to mean a deficiency in income tax. The evidence shows and we have found therefrom that a part, if not all, of each of the deficiencies for the years herein was due to fraud. Section 6653(b) is applicable, and the respondent did not err in his determination of the additions to tax for fraud. Decision will be entered for the respondent. Footnotes
*. Although not too clear, there is some indication of record that the jeopardy assessments were too late to be effective to any substantial degree.↩